COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.                                    SUPERIOR COURT
                                             CIVIL ACTION NO. 2013-407-D

CYGNET CORPORATION, d/b/a Cygnet Restaurant,    )
On Behalf of Themselves, the General Public and  )
All Others Similarly Situated                     )
                    Plaintiffs.                   )
                                                  )
        v.                                        )
                                                  )  CLASS ACTION COMPLAINT
LEASE FINANCE GROUP, LLC                          )
NORTHERN LEASING SYSTEMS, INC.,                   )
GLOBAL LEASING COMPANY, INC.,                     )
JAY COHEN, LEONARD MEZEI,                         )
SARA KRIEGER, DREW KENNEDY                        )
and PAYMENT SYSTEMS, INC.                         )
                    Defendants.                   )

## COMPLAINT AND DEMAND FOR JURY TRIAL

### INTRODUCTION

The Plaintiffs named herein, by and through their counsel, bring this Class Action

Complaint against the Defendants named herein, on behalf of themselves and those

similarly situated, for violation of M.G.L. c.93A., §§ 2 and 11.  Plaintiffs also seek relief

for common law fraud, deceit and misrepresentation, negligent misrepresentation,

conversion, breach of contract, and unjust enrichment.  The following allegations are

based upon information and belief, including the investigation of Plaintiffs' counsel,

unless stated otherwise.

Defendants are engaged in a nationwide predatory scheme of defrauding small

business owners in correlation with the sale of electronic payment processing services,

including the processing of credit card transactions.  Defendants persuade small

businesses to enroll in the electronic payment processing services by promising low rates without disclosing said rates. After Defendants display small business owners with enrollment forms and contract documents, and the documents are signed, Defendants dramatically alter the contracts by filling in blank areas with new terms that were never presented originally and by sometimes adding pages that were never shown to Plaintiffs. These newly added terms and pages include purported provisions for early termination fees, liquidated damages, liability limitations, and choice-of-law and choice-of forum provisions. Sometimes, Defendants go so far as to forge the initials or signatures of the small business owners on the newly added pages or filled in areas.

The contracts contain unconscionable provisions, including long-term leases that require the small businesses to pay outrageously inflated monthly rental fees for credit card processing terminals and inflated early-termination fees, require the business owners to personally guarantee the contracts, and contain choice-of-law and choice-of forum provisions that purport to allow Defendants to sue the businesses and their owners in states that have no connection to the transaction and no personal jurisdiction. Defendants make automatic debits from the business owners' accounts to collect their higher-than- disclosed processing rates and their inflated rental fees, and if the business owners close the accounts, they bring lawsuits based on the contracts in the far-away forums. When the business owners sue Defendants on claims such as those in this suit, Defendants often settle out of court prior to class certification.

## PARTIES

### PLAINTIFFS

1. Plaintiff Cygnet Corporation is a corporation based out of 212 Hart Street, Beverly Farms, Massachusetts. It asserts claims in this Complaint individually and on

behalf of all others similarly situated against Defendants Lease Finance Group, LLC,

Northern Leasing Systems, Inc., Global Leasing Company, Inc., Jay Cohen, Leonard

Mezei, Sara Kreiger, Drew Kennedy and Payment Systems Inc.

## DEFENDANTS

2.      Defendant Lease Finance Group, LLC ("LFG") is a Delaware corporation

with its principal place of business at 132 West 31st Street, New York, New York. LFG

is engaged in the equipment lease financing business.

3.      Defendant Northern Leasing Systems, Inc. ("NLS") is a New York

corporation with its principal place of business at 132 West 31st Street, New York, New

York. NLS is engaged in the equipment lease financing business and upon information

and belief is the affiliate, alter ego and umbrella organization of LFG and many other

shell entities that conduct leasing operations at the same address and use the same staff as

NLS.

4.      Defendant Global Leasing Company ("Global") is a corporation with its

principal place of business at 633 West Fifth Street, #6770, Los Angeles, California.

5.      Defendant Jay Cohen ("Cohen") is the President and Chief Executive

Officer of NLS, and an officer of LFG.  Cohen is one of its masterminds of the enterprise

which is the subject of this action.

6.      Defendant Leonard Mezei ("Mezei") is the Chairman of the Board of NLS

and is also an officer of LFG.

7.      Defendant Sara Krieger ("Krieger") is the Vice President for Operations of

NLS.

8.      Defendants Cohen, Mezei, and Krieger, direct and control NLS, LFG and various shell entities as more fully described below. (Together, NLS, LFG, Global, Cohen, Mezei, and Krieger are referred to herein as the "Lease Finance Defendants.") Cohen, Mezei, and Krieger worked in concert to cause NLS, LFG, Global, and the shell entities to engage in the conduct described in this complaint.

9.      In particular, the individual Defendants each directed NLS, LFG, Global, and the shell entities to maintain continuous and systematic contacts with other members of the scheme and further directed the NLS, LFG, shell entities, and certain other members of the scheme. Further, as more fully described below, to consummate the unlawful transactions described herein with Class Members, to unlawfully deduct monies from Class Members' accounts, and to attempt to enforce unlawful contractual provisions against Class Members. Cohen, Mezei, and Krieger have all profited personally from those activities.

10.     Defendant Drew Kennedy is an Independent Account Executive for Payment Systems, Inc. located at 750 North Saint Paul Street, Suite 1350, Dallas TX.

11.     Defendant Payment Systems, Inc. ("Payment Systems") is a corporation with its principal place of business at 5901 Priestly Drive, Suite 303, Carlsbad, California 92008. Payment Systems is a provider of merchant service card services; such providers are also referred to in the industry as "Independent Service Organizations" or "ISOs."

12.     Payment Systems is one of the ISOs with whom the Lease Finance Defendants have conspired to carry out their fraudulent scheme. (Payment Systems are referred to herein as the "ISO Defendants.")

## FACTS PERTAINING TO ALL CLAIMS

**A.    OVERVIEW**

13.    Defendants are engaged in a nationwide scheme to defraud individual consumers and small business owners in connection with the sale of electronic payment processing services, including the processing of debit and credit card transactions, and the leasing of associated equipment.  Operating through over 100 shell entities (the "Shell Entities") from the same offices with the same staff and same modus operandi, the Lease Finance Defendants pay substantial commissions to their agents, including the ISO Defendants, to obtain, by any means, Class Members' signatures on a standard form application/contract ("Form Lease").  To obtain that signature, Defendants promise individual consumers and small business owners low transaction fees for their processing services.  After the applicant has signed the Form Lease, Defendants alter it by filling in blank areas with new terms contract and by adding pages that were never shown to the applicants.  These newly added pages and terms include purported provisions for early termination fees, liquidated damages, liability limitations, arbitration clauses, and choice-of-law and choice-of forum provisions.  Occasionally, Defendants go so far as to forge the initials or signatures of the individual consumers and small business owners on the newly added pages or filled in areas.  Further, the original document that the Class Members' sign do not have the word "Lease" on it as it is fraudulently added later.

14.    The altered contracts contain unconscionable provisions, including long-term leases that require the individual consumer or small business owner to pay wildly inflated monthly rental fees for credit card processing terminals and inflated early-termination fees, and require the individual consumer and small business owners to personally guarantee the contracts.  The contracts also authorize Defendants to debit

payments purportedly due under the agreements directly from the customer's bank account.

15.   Once Class Members' signatures are obtained (or fraudulently inserted through electronic or written forgery); Defendants electronically debit Class Members' bank accounts for the higher-than-disclosed processing rates, inflated rental fees, and other unauthorized charges.  Defendants' inflated or unauthorized withdrawals include:

    a.   over-charges for property taxes, where Defendants pocket the difference between what was charged and what Defendants paid;

    b.   an undisclosed $25.00 "filing fee" for property tax returns in connection with such property tax payments; and

    c.   charges of $4.95 per month per piece of leased equipment towards an "LDW" ("loss damage waiver") program, which program purports to provide what is in fact illusory insurance.

**i.**   **Lease Financing and Independent Sales Organizations**

16.   Defendants are involved in various aspects of the market for electronic payment processing services, which involves several different players, often working together to defraud individuals and small business owners who have need of such services.  The Lease Finance Defendants supplied financing for the leasing of electronic point-of-sale equipment, such as ATM machines, cash registers, and credit card processing equipment.  Moreover, The Lease Finance Defendants conspire with providers of payment processing services, the ISOs, to defraud merchants who have need of such services.  The ISO Defendants are among the ISOs who are part of the predatory scheme.

17.   In order to accomplish their fraudulent scheme, the Lease Finance Defendants have established relationships with ISOs all over the United States.  The ISOs

act as agents for the Lease Finance Defendants and provide the sales force necessary to effectuate the scheme orchestrated by the Lease Finance Defendants.

18.   Sales agents working for the ISOs and, in furtherance of the scheme, approach merchants who may want to use, or who already use, electronic payment processing services and convince them to sign up for the ISO's services.  The sales agent also offers the merchant a lease with the Lease Finance Defendants for the equipment necessary to process payments.  Thus, the sales agent sells both the ISO's processing services and the Lease Finance Defendants' leasing services in what appears to the merchant to be a single, undivided transaction.  Lease of the equipment through the Lease Finance Defendants is presented by the sales agent as a requirement for obtaining the ISO's processing service.

19.   The leases offered by the Lease Finance Defendants are exorbitantly inflated and unconscionable.  The Lease Finance Defendants lease equipment with a fair market value between $200.00 and $400.00 if purchased outright for lease payments between $100.00 and $400.00 per month over a period of 48 months.

20.   The Lease Finance Defendants are able to get merchants to agree to these exorbitant rates by having the sales agent promise huge savings on the monthly cost of the ISO's processing services, so that the net cost to the merchant is made to appear lower than the cost of processing services offered by competitors.  Thus, by offering the processing services and the leases together through a single sales agent, the Defendants are able to inflate the cost of the equipment lease and hide the inflated cost.

21.   The ISOs also profit because the cost savings are illusory; in reality, through a variety of techniques described below, the ISO charges the merchant substantially more than the sales agent represents.  In addition, the Lease Finance Defendants share the

exorbitant cost of the lease with the ISO, in effect paying the ISO to assist them in selling

the unconscionable lease to the merchant.

22.   In a legitimate lease transaction, the lessor's ability to inflate the lease

payment is usually limited by value of the equipment as security for the lease.  If the

lessee defaults on the lease, the lessor will want to be able to repossess the equipment and

offset its loss.  However, where the lease calls for payments totaling more than twenty

times the value of the equipment repossession provides no cure if the lessee defaults.  The

Lease Finance Defendants are able to dodge this limit on their ability to offer exorbitantly

inflated leases by requiring merchants personally to guarantee the lease payments.

Having secured this personal guarantee, the Lease Finance Defendants are free to set any

payment amount they choose, with no relationship to the value of the equipment being

leased, so long as the sales agent can convince the merchant that the ISO will make up

the cost through discounts on processing services.

23.   Nor are the Lease Finance Defendants content with the rewards of their

unconscionably priced leases, sold through fraudulent statements about the cost of

processing services offered by the ISOs.  As part of the process of entering into the lease,

merchants are required to provide information sufficient to allow the Lease Finance

Defendants to debit lease payments automatically from the merchant's bank account.

The Lease Finance Defendants then use this information to withdraw additional amounts

of money from merchants' accounts beyond the already-inflated cost of the lease.  The

Lease Finance Defendants claim that these payments represent additional fees authorized

by the leases the merchants have signed, but in many cases, these fees are contained on

pages not shown to the merchant, but rather fraudulently added to the lease after the

merchant has already signed, or even on pages which the merchant's signature has been

forged.  Even where fees may be authorized, the Lease Finance Defendants often

withdraw more money from the merchant's bank account than the amount they may

legitimately be authorized to charge for a particular fee or service.

24.    For their part, the ISOs, including the ISO Defendants, use these same

techniques to charge more for their services than the discounted prices used to induce

merchants to sign up in the first place.  Just as the Lease Finance Defendants obtain

banking information and authorization to debit a merchant's bank account directly, so too

the ISOs obtain this information to cover the monthly processing fees.  They, too, then

debit the bank account for amounts in excess of the rates promised to the merchants.

Further, these additional fees may be contained on pages of the processing agreement that

were never shown to the merchant and only added to the agreement by the ISO after the

merchant has already signed.  The ISOs, including the ISO Defendants, may even forge

the merchant's signature on such additional pages.  They also withdraw amounts in

excess of the amounts authorized and may even continue to debit the merchant's bank

account after the agreement has been terminated.

25.    By the time the merchant realizes that the amounts being debited from the

bank account are in excess of the amounts represented, it is too late.  Defendants tell the

merchant that the agreements cannot be cancelled.  They continue to debit the merchant's

bank account for unauthorized amounts and unconscionable lease payments.

**B.    CONSPIRACY**

26.    Defendants have conspired with one another and with other unscrupulous

ISOs and agents to defraud consumers and small businesses and hide profits earned

through their fraudulent criminal activities.

27.   At all times herein mentioned, each of the Defendants was the agent, servant, representative, officer, director, partner or employee of the other Defendants and, in doing the things herein alleged, was acting within the scope and course of his/her/its authority as such agent, servant, representative, officer, director, partner or employee, and with the permission and consent of each Defendant.

28.   At all times herein mentioned, Defendants, and each of them, were members of, and engaged in, a joint venture, partnership and common conspiracy, and acting within the course and scope of, and in pursuance of, said joint venture, partnership and common conspiracy.

29.   At all times herein mentioned, the acts and omissions of Defendants, and each of them, added to the various acts and omissions of each and all of the other Defendants in proximately causing the injuries and damages as herein alleged.

30.   At all times herein mentioned, Defendants, and each of them, ratified each and every act or omission complained of herein.  At all times herein mentioned, the Defendants, and each of them, aided and abetted the acts and omissions of each and all of the other Defendants in proximately causing the damages, and other injuries, as herein alleged.

31.   NLS, LFG and the Shell Entities operate under the direction of Jay Cohen and Leonard Mezei, who manage the operations of NLS and LFG and their participation in the conspiracy.  Defendants Cohen and Mezei oversee the operations of NLS, LFG and the Shell Entities, making key decisions to further the fraud and increase the profits of NLS, LFG and the Shell Entities. Cohen and Mezei coordinate and execute the overall scheme to defraud Class Members, including but not limited to holding the Shell Entities out as separate businesses, even though their true intent was to use the shell companies to

confuse and mislead victims and the courts.

32.   Defendants Cohen and Mezei know that the leases enforced by the NLS, LFG and the Shell Entities had been obtained through fraud, forgery, and deceit, and have structured the Shell Entities to further that fraud and ensure that victims who are harmed cannot be adequately compensated.

33.   Defendant Sara Krieger participates in the conspiracy and makes certain its success by soliciting new ISOs and executing the fraudulent lease agreements. Defendant Krieger knows or reasonably should know that these leases have been forged or obtained through fraud and deceit, but approves them to increase her own personal profit and the profits of the NLS, LFG and the Shell Entities.

## C.   THE MISLEADING FORM LEASE

34.   The first page of the Form Lease appears to be a complete document.  It contains all the material information normally associated with such transactions (name, address, amount, equipment information, term, bank information) and signature blocks for both parties; however, that first page contains nothing incorporating the remaining three pages, or even alerting Class Members to the existence of additional pages that may be part of the Form Lease.  The first page of the Form Lease contains the following statement which appears in a box under the caption "Lease Acceptance," which box also contains the space for Class Members' signature:

> "THE UNDERSIGNED HAS READ ALL PAGES OF THIS LEASE WITH ALL TERMS FILLED IN AND AGREES TO BE BOUND BY ALL TERMS OF THE LEASE"

35.   That "Lease Acceptance" box is followed by two other boxes on the same page. One box provides for Class Members' personal guaranty, and the other is for signature of acceptance by Defendants.  Consequently, the first page effectively conveys

that the Form Lease is a one page document.  Class Members are routinely led to believe

that the Form Lease is comprised of just that one page, which belief was actively fostered

by Defendants' agents at the time of lease-signing.

36.   The Document that the Class Member signs also does not state it is a "Non

Cancellable Lease".  Those words are later added in.  Further, the amount due and length

of the lease (usually 48 months) are always blank when a Class Member signs.  Those

terms are also added in later.

37.   The date of that the Defendants' sign the document is also usually over a

month later.

38.   The lease is then assigned that same day to one of the many shell companies

of the Lease Finance Defendants.

**D.   FAILURE TO MAKE AVAILABLE COPIES OF THE FORM LEASE TO CLASS
MEMBERS AT TIME OF LEASE SIGNING**

39.   Consistent with this unlawful scheme, Class Members are never given

copies of the Form Lease left with Class Members at the time of signing; instead, Class

Members are simply told that a copy will be mailed to them.  By that time, of course,

Defendants assert that the Form Lease has allegedly become "irrevocable" and non-

cancelable for the entire term, usually 48 months.

40.   Moreover, even when Defendants belatedly send copies of the Form Lease,

i.e., after it has allegedly been accepted and become irrevocable, such copies are made at

reduced size (2 pages reduced to 1).  n so doing, the already unreadable, legalistic terms

are rendered even more difficult to read or understand by Class Members.  Accordingly,

it is often months before Class Members even know all the terms of the Form Lease.

## E.   CONCEALMENT OF MATERIAL FACTS

41.   Defendants' agents deceptively induce Class Members, with assenting misrepresentations and concealment of material facts, to sign the Form Lease. Defendants then disown these fraudulent inducements, and claim that the Form Lease represents an irrevocable commitment for overpriced items at burdensome terms. Unbeknownst to Class Members at the time of signing, the leased equipment items are typically available in the market for outright purchase, free and clear, at a small fraction of the price Defendants charge over the term of the lease.

42.   Defendants regularly disclaim all their agents' representations made at Form Lease inception, and point to the merger clause of the Form lease as justification for attempts to enforce the onerous and unconscionable terms of the remaining, unseen pages of the Form Lease.  In fact, an integral part of Defendants' fraudulent scheme is the active concealment from Class Members of the harsh terms of the three undisclosed pages of the Form Lease, which includes provisions that purport to:

   a.   entitle Defendants to charge sums significantly higher than those specified in the first page of the Form Lease;

   b.   allow for automatic electronic deductions from Class Members' bank accounts;

   c.   continue indefinitely Class Members' other Form Lease obligations unless Class Members gave a specific advance 30-day notice of cancellation, with a buyout balloon payment, at the end of the specified term;

   d.   immunize Defendants from any warranties for the equipment;

   e.   shield Defendants from answering for any failure or malfunction of the equipment even though Defendants retain title to the leased equipment;

    f.    make absolute and non-cancelable the Class Member's obligation to pay Defendants;

    g.    impose upon Class Members an insurance obligation to Defendants with respect to the equipment leased;

    h.    allow Defendants, in the event of an alleged default, "without demand or legal process [to] enter into the premises where the equipment may be found" and repossess or disable the equipment;

    i.    impose charges for late payment of monthly dues an extortionate 15%, with a minimum of five dollars;

    j.    add a provision that any litigation would be venued in New York or such other place where the "holder of lessor's interest" - i.e., Defendants or any of their 100 shell-entities - "maintains its principal office for administrating this lease." In other words, the forum would be (and most commonly was) far away from Class Members' homes and businesses. Furthermore, the chosen forum could be changed by Defendants at any time by simply transferring the Form Lease to one of their affiliates registered - or to be registered - elsewhere; and

    k.    allow that Defendants - but not Class Members - may affect service of process for a legal proceeding by certified mail, return receipt requested.

## F.   DEFENDANTS' EXPLOITATION REGARDING CLASS MEMBERS WHO OBJECT OR DEFAULT

43.  In the event of default by lessees, Defendants routinely proceed against the Class Member guarantors personally. Defendants promptly proceed to disparage the guarantor's personal credit, and damaging the guarantor's consumer credit score, by repeatedly pulling his/her personal credit report, and by making inaccurate and adverse

credit entries in disregard of federal and state credit reporting statutes. Defendants manufacture these adverse entries in the guarantor's personal credit report even before they commence legal proceedings against the primary obligor. Such adverse entries end up costing Class Members dearly, sometimes up to tens of thousands of dollars.

44.   Defendants' approach to collection is aggressive. They use the undisclosed provisions of the Form Lease described above to obtain payment, dunning Class Members with collection letters, threatening to disparage their personal credit reports, and obtaining default judgments against those who still refuse to pay.

45.   In these phone calls, Defendants' representatives expressly and routinely tell Class Members that it would be more expensive for such Class Members to litigate Defendants' claims in New York than it would be to pay off Defendants. When Class Members do not yield to this blatant threat, Defendants chase them with repetitive and abusive phone calls, in an attempt to interfere with their personal or business operations. Defendants' representatives exasperate and bully Class Members in this manner at home, at work, and at any other telephone number for such Class Members that Defendants can find.

46.   When Defendants commence legal proceedings, Class Members rarely have the opportunity to raise any defenses. Defendants regularly file their collection suits in New York, despite the fact that most of the Class Members reside in far-away states. Few, if any, can afford the expense of litigation in a distant forum, and even Class Members who do obtain counsel are hampered by the undisclosed Form Lease provision. Given the amounts in controversy, it is financially burdensome and impractical for Class Members to gather evidence and put on potential witnesses in their defense, because they

are most often located in Class Members' home states, far from the New York City Civil Court.

**G.     DEFENDANTS' FRAUDULENT CHARGES**

47.   Defendants routinely charge amounts in excess of those in the Form Leases and/or amounts which are not even disclosed in the Form Lease.

**i.     Loss Damage Waiver**

48.   First, Defendants routinely charge a fee of $4.95 per month per piece of equipment leased for a "loss & damage waiver" ("LDW"). This fee is assessed upon all lessees who purportedly do not provide proof of insurance. Defendants' Form Lease typically provides on the undisclosed third page of the Form Lease (of which most Class Members are unaware) that an unspecified amount would be assessed towards LDW. The Form Lease does not disclose how often the LDW would be charged, and further authorizes Defendants to change that unspecified amount at any time for any reason.

49.   The Form Lease conditions this levy of the LDW charge upon a Class Member's failure to provide proof of insurance to Defendants prior to lease commencement, which is, in turn, conditioned upon Defendants' request for such proof; but Defendants routinely do not request proof of insurance coverage from Class Members, thereby ensuring that Class Members remain unaware of the LDW charge or the need to provide proof of insurance to avoid the charge at lease inception.

50.   Also undisclosed to Class Members is that Defendants' LDW "program" has a deductible of $200.00. As Defendants are certainly aware, the replacement cost of the equipment covered is far below this deductible.

### ii.    **Property Taxes**

51.    Upon information and belief, Defendants initially used "acquisition cost" as the property tax basis for leased equipment, defined as the cost of acquiring the lease. Defendants soon shifted to a value for the property tax basis that was almost universally much lower that the acquisition cost, while nevertheless continuing to collect from Class Members at the much higher

### iii.    **Filing Fees**

52.    Third, in addition to the property taxes, Defendants charged Class Members a filing fee of $25 per property tax payment. The existence, amount, and frequency of this filing fee is concealed from Class Members by Defendants, who levy it capriciously, even though Defendants were well aware that the filing fee was not authorized by the Form Leases.

### H.    **CYGNET CORPORATION'S TRANSACTION**

53.    In May 2011, James Glesener ("Glesener"), president of Cygnet Corporation, was approached at his place of business by Drew Kennedy ("Kennedy"), as an Independent Account Executive of Defendant Payment Systems, who promised him that he could substantially reduce his costs for credit card processing if he agreed to enter an agreement with Payment Systems for his processing equipment. At the time, Glesener was using Sovereign Bank for electronic payment transactions.

54.    Kennedy promised Glesener a pricing plan for processing services which he set out in detail on a worksheet. The worksheet showed discounted rates for transaction and authorization fees for credit and debit cards. (See, Payment Systems Worksheet, attached hereto as Exhibit A.) The discounts for processing services were so extortionate that the worksheet showed that Glesener would save $159.00 per month as compared to

the fees he was then paying for credit card processing services even after deduction of payments for an equipment lease.

55.   On May 14, 2012, Glesener signed a document on behalf of Cygnet Corporation that was later altered to become a "Non-Cancellable Lease" with Global for credit card processing equipment.  The term of the lease was 48 months and the lease payments were both blank when he signed it.  He did not initial the accompanying pages that had any lease language written on it.  (See, purported Lease attached hereto as Exhibit B.)

56.   Glesener was given many assurances that he was simply signing unimportant paperwork.  At no time during the meeting with Kennedy was he told he was signing a lease and Glesener affirms any documentation he did sign did not have the words "Lease" on it or list any terms.  He absolutely would not have signed anything if the terms or the word "Lease" was present on any of the documentation.

57.   Glesener never provided his bank information on any document titled "Non-Cancellable Lease."  He only provided his banking information to Kennedy on a separate document so that he would receive his promised savings.

58.   Upon information and belief, Glesener's signature, initials and bank information was forged on a document titled "Non-Cancellable Lease."

59.   Glesener never received a copy of the Lease on May 14, 2012.  He immediately called Kennedy to ask for one once he realized he did not receive a copy and could never get through to him. He has not heard from Kennedy since.

60.   On June 28, 2012, Glesener received a letter from LFG, an entity with whom he had no contract, no prior relationship, and about which he knew nothing, purporting to confirm that it had provided lease financing for certain equipment. The letter also notified

Glesener that he was now being charged a $4.95 per month Loss Damage Waiver fee for failing to provide evidence that he had obtained a certificate of insurance covering the equipment. (*See*, Letter from LFG dated June 28, 2012 attached hereto as <u>Exhibit C</u>.) At or around the same time Glesener received a copy of the Bill of Sale and Assignment between Global and LFG. Conveniently, Global executed the Lease on June 25, 2012, the very same day the Bill of Sale and Assignment was executed. (See, Bill of Sale and Assignment, attached hereto as <u>Exhibit D</u>.)

61.   Glesener then finally received a copy of the document he signed and noticed the term "Non-Cancellable Lease" was added to it as was other pages. Further, the payment of $297.00 and the term of 48 months were added as was his banking information. (See, Glesener's Sovereign Bank Online Banking Statement, attached hereto as <u>Exhibit E</u>.)

62.   A short time later, Glesener received his first bank statement including fees charged for transactions with his new equipment. To his surprise, he discovered he was debited almost $336.95 and $46.96 twice for a total of $430.87. Nearly double more in total fees than he had with his previous provider, notwithstanding the promises which had been made to him by Kennedy that he would receive a savings of $158.00 a month.

63.   When Glesener tried to contact Payment Systems to complain, he was met with complete indifference and a blanket refusal to honor the transaction rates which had formed the basis of his bargain with Payment Systems.

64.   A few weeks later Glesener was debited from his bank account again and was forced to close his bank account and open a new one. After opening a new account, he received another bill on July 25, 2012 for further charges of fees that he never agreed

to totaling $143.95.  (See, Merchant Statement Summary of Bankcard Deposits, attached

hereto as Exhibit F.)

## I.   OTHER SIMILAR COMPLAINTS NATIONWIDE

65.   The Better Business Bureau of Chicago/Northern Illinois gives LFG an "F"

rating and reports 739 Complaints against LFG on its website with the following entry:

> "Consumer complaints allege misrepresented and objectionable sales
> practices, and/or unauthorized charges and debits from consumers' bank
> accounts, and/or lack of notification of end of contract and subsequent
> renewal and billing. Further complaints allege technical problems with the
> credit card processing equipment provided by Lease Finance, and
> difficulties in either obtaining help from the company or returning the
> equipment in a timely fashion. The company deems that returning its own
> equipment does not relieve consumers from their payment obligations per
> the lease agreement, despite the fact that the consumers may no longer
> have any equipment and/or receive any services. Additional complaints
> allege that the three day right of rescission and timely termination of
> contract have not been honored. Other allegations cite poor customer
> service, being hung up on by company representatives, the company
> pursuing allegedly unwarranted collection actions and contacting credit
> report agencies despite consumers' continuous attempts to provide
> documentation to support their cases. Upon sending requested
> documentation to Lease Finance, multiple consumers allege that the
> company declines receiving it and/or claims it was sent to the wrong
> location. Additional consumers allege to have never signed contracts with
> the company and question where the alleged signatures baring their names
> came from."

66.   A review of internet consumer sites reveals an abundant amount of similar

complaints.

67.   Moreover, on April 23, 2012, Attorney General Eric T. Schneiderman

announced a lawsuit against LFG and its shell companies.  The release states:

> "Attorney General Eric T. Schneiderman today announced a lawsuit against a
> group of New York City-based business equipment leasing companies that
> fraudulently siphoned millions of dollars from their former customers, including
> mom-and-pop stores and other small businesses. Northern Leasing Systems, Inc.
> and its affiliates, which lease credit card processing machines and other
> equipment, carried out a deceptive scheme to drain over $10 million in

unauthorized debits from the bank accounts of over 100,000 former customers up to 11 years after their equipment leases had expired, ultimately retaining at least $3.5 million."

## CLASS ALLEGATIONS

68.   Plaintiffs bring this action against Defendants on behalf of themselves and all others similarly situated.  The Class is defined as follows:

> All persons (including natural persons, corporations, partnerships, or other legal entities) who, from August 11, 2004 to the present, applied or contracted for merchant card services and/or related equipment leasing with any of the Defendants.

Such persons shall be referred to as "Class Members" or "class members."

69.   This action has been brought and may properly be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

70.   <u>Numerosity</u>:  Plaintiffs do not know the exact size of the class, but it is estimated that it is composed of more than 100 persons.  The persons in the class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

71.   <u>Common Questions Predominate</u>:  This action involves common questions of law and fact to the potential class because each class member's claim derives from the same set of deceptive, unlawful and/or unfair statements and omissions. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the class to recover.  Among the questions of law and fact common to the class are:

a.   Whether Defendants engage in activity designed to defraud the Class;

    b.   Whether the contracts entered into by class members are enforceable and/or unconscionable;

    c.   Whether Defendants unfairly, unlawfully and/or deceptively failed to provide class members all pages of operative agreements;

    d.   Whether Defendants unfairly, unlawfully and/or deceptively failed to inform class members of the exorbitant rates for leasing equipment;

    e.   Whether Defendants' advertising and marketing materials regarding their merchant card services and/or equipment that they sold or leased were likely to deceive Class Members or was unfair;

    f.   Whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

    g.   The amount of revenues and profits Defendants received and/or the amount of monies or other obligations lost by Class Members as a result of such wrongdoing;

    h.   Whether Class Members are entitled to declaratory, injunctive and other equitable relief and, if so, what is the nature of such relief;

    i.   Whether Class Members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief; and

    j.   Whether Class members are entitled to disgorgement and/or restitution.

73.   <u>Typicality</u>: Plaintiffs claims are typical of the class because Plaintiffs completed applications and/or entered into contracts with Defendants and their agents that are identical or nearly identical to the standard form contract used by Defendants and their agents.  Thus, Plaintiffs and Class Members sustained the same injuries and

damages arising out of Defendants' conduct in violation of the law. The injuries and damages of each Class Member were caused directly by Defendants' wrongful conduct in violation of law as alleged.

74. Adequacy: Plaintiffs will fairly and adequately protect the interests of all Class Members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests that are in conflict with or antagonistic to the interests of Class Members.  Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and that of the class.  No conflict of interest exists between Plaintiffs and Class Members hereby, because all questions of law and fact regarding liability of Defendants are common to Class Members and predominate over any individual issues that may exist, such, that by prevailing on their own claims, Plaintiffs necessarily will establish Defendants' liability to all Class Members.  Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class Members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class Members.

75. Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action.  The prosecution of individual remedies by members of the Class will tend to establish inconsistent standards of conduct for the Defendants and result in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties.  Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum

simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender.  Furthermore, as the damages suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

### CLAIMS FOR RELIEF

### COUNT I

### M.G.L. c.93A, §§ 2, 11

76.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

77.   Defendants have engaged in unfair competition or unfair or deceptive acts or practices in violation M.G.L. c. 93A, §§ 2, 11 by wrongfully taking fees and other charges from Plaintiffs' and Class Members' bank accounts and charging Plaintiffs and Class Members exorbitant and unconscionable rates for leasing of credit card processing equipment.  Plaintiffs also seek remedies for Defendants' failure to adequately notify customers of this practice.

78.   Defendants engaged in material, deceptive acts, in trade and commerce that injured Massachusetts citizens in violation of M.G.L. c.93A, §§ 2, 11.

79.   Defendants engaged in commercial activity that did harm to the public interest and the public at large that was directed to consumers like Plaintiffs and which affected similarly situated consumers.  Class Members were treated like customers of the individual ISOs and banks, and their personal accounts were debited accordingly.

80.   The unfair and deceptive acts and practices of Defendants have directly, foreseeably, and proximately caused or will cause damages and injury to Plaintiffs and the members of the Class.

81.   The actions and failures to act of Defendants, and the above described course of fraudulent conduct and fraudulent concealment, constitute acts, uses, or employment by Defendants of unconscionable commercial practices, deception, fraud, false pretenses, misrepresentations, and the knowing concealment, suppression or omission of material facts with the intent that others rely upon such concealment, suppression, or omission of material facts in connection with the sale and or/leasing of merchandise of Defendants in violation of M.G.L. c.93A, §§ 2, 11.

82.   Plaintiffs and Class Members relied upon Defendants' misrepresentations and omissions in applying for and entering into equipment lease contracts and by reason of the unlawful acts engaged in by Defendants, Plaintiffs and the Class have suffered ascertainable loss and damages.

83.   Plaintiffs and all others similarly situated were injured by Defendants' deceptive acts because they unknowingly were charged and improperly assessed fees to their bank accounts that they would otherwise not have incurred.

84.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class were damaged, and are entitled to compensatory damages, treble damages, attorneys' fees and costs of suit, in an amount to be proved at trial.

## COUNT II

### Common Law Fraud

85.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

86.   Defendants made misrepresentations and omissions of facts material to Plaintiffs' and Class members' decisions to apply for and lease credit card processing equipment as set forth in detail above by actively concealing, and causing others to conceal, true information about the nature and implications of the application and contracts for the equipment and by not revealing to Plaintiffs and class members the entirety of the contracts.

87.   Defendants knew at the time that it made these misrepresentations and omissions that they were false or that Defendants had failed to disclose facts it was obligated to disclose in order to make its other representations not misleading. Defendants were aware that Plaintiffs and class members would rely on these misrepresentations and omissions, and that such representations were material in the Plaintiffs' and class members' decisions to apply for and enter into equipment lease contracts with Defendants.

88.   Plaintiffs and the Class reasonably relied upon Defendants' misrepresentations and omissions of material fact.  Plaintiffs and the Class had no reason to doubt the veracity or validity of the information Defendants promoted through its marketing and sales strategies.

89.   Defendants' misrepresentations and omissions of material fact directly and proximately caused Plaintiffs' and the Class's damages.

90.   By virtue of the fraud they perpetrated on Plaintiffs and the Class, Defendants are liable to Plaintiffs and the Class for all damages Plaintiffs and the Class have sustained, plus punitive damages, plus the cost of this suit, including attorney's fees.

## COUNT III

### Unjust Enrichment

91.   Plaintiffs incorporate by reference all preceding paragraphs as if fully set forth herein.

92.   As an intended and expected result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from payments Plaintiffs and the Class made for equipment leases.

93.   In exchange for the payments they made for the leases, and at the time it made these payments, Plaintiffs and the Class expected that the equipment lease contracts were disclosed in full, that they would pay reasonable rates, and that Defendants had provided all of the necessary and accurate information and disclosed all of the lease contract's terms.

94.   Defendants have voluntarily accepted and retained these payments with full knowledge and awareness that, as a result of their wrongdoing, Plaintiffs and the Class paid exorbitant and unconscionable rates and fees for equipment leases when they otherwise would not have done so. The failure of Defendants to provide Plaintiffs and the Class with the remuneration they expected enriched Defendants unjustly.

95.   Plaintiffs and the Class are entitled in equity to seek restitution of Defendants' wrongful profits, revenues and benefits to the extent and in the amount deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy Defendants' unjust enrichment.

## COUNT IV

### Deceit, Fraud and/or Misrepresentation

96.   Plaintiffs incorporate by reference and realleges all paragraphs previously alleged herein.

97.   The misrepresentations, nondisclosure and/or concealment of material facts made by Defendants to Plaintiffs and the members of the Class, as set forth above, were known by Defendants to be false and material and were intended by the Defendants to mislead Plaintiffs and the members of the Class.

98.   Plaintiffs and the Class were actually misled and deceived and were induced by Defendants to incur charges and fees they otherwise would not have incurred.

99.   As a result of the conduct of Defendants, Plaintiffs and the class members have been damaged by having incurred unwarranted fees and charges taken from their bank accounts.

100.  By reason of the foregoing, Defendants are liable to Plaintiffs and the class members for deceit, fraud, and/or misrepresentation in an amount to be proved at trial.

### COUNT V

### Negligent Misrepresentation

101.  Plaintiffs incorporate by reference and realleges all paragraphs previously alleged herein.

102.  Defendants had a duty to provide honest and accurate information to Plaintiffs and class members to prevent them from incurring exorbitant, fraudulent and unconscionable fees and charges associated with equipment leases.

103.  Defendants specifically and expressly indicated to Class members that the application for a "free trial" for credit card processing equipment and the amount they

would be charged for "terminal fees" was true and reliable, and that the lease contracts that Plaintiffs and class members agreed to were complete and included all terms, when in fact these representations were inaccurate and unreliable.

104. Such misrepresentations were and are made by Defendants through the use of terms like "free trial" and "terminal fees," when in fact such representations were not what they were purported to be, and the various marketing materials and the contracts foisted on Plaintiffs and class members by Defendants were also misleading and false.

105. Defendants knew or in the exercise of reasonable diligence should have known, that the ordinary consumer and customer of Defendants' products would understand Defendants' representations concerning the term "free trial" as being what it purported it to be -- "free" -- and that the "terminal fees" charged would be precisely what was represented they would be. Defendants also knew, or in the exercise of reasonable diligence should have known, that the ordinary consumer and customer of Defendants' products would understand and believe these various representations as accurate and reliable and that any other understanding on the part of consumers would not be reasonable given Defendants' representations.

106. Plaintiffs and class members justifiably relied on Defendants' misrepresentations and made applications for and entered into lease contracts for credit card processing equipment, and were subsequently charged exorbitant rates and fees.

107. As a result of the conduct of Defendants, Plaintiffs and class members have been damaged by having relied on Defendants' misrepresentations with regard to the equipment lease contracts.

108. By reason of the foregoing, Defendants are liable to Plaintiffs and the class members for negligent misrepresentation in an amount to be proved at trial.

## COUNT VI

### Conversion

109. Plaintiffs incorporate by reference and realleges all paragraphs previously alleged herein.

110. Plaintiffs and the Class members own and have the right to possess the money that is in their bank accounts.

111. Defendants interfered with Plaintiffs' and the Class members' possession of this money by wrongfully taking directly from their bank accounts fees and charges associated with leases of credit card processing equipment from Defendants despite the fact that Plaintiffs and class members had never authorized such deductions at the rates and fees charged. Plaintiffs and the Class members never consented to Defendants taking such fees and charges from their bank accounts.

112. Plaintiffs and the Class members have been damaged by Defendants' wrongful taking of such fees and charges from their bank accounts in an amount that is capable of identification through Defendants' records.

113. By reason of the foregoing, Defendants are liable to Plaintiffs and the class members for conversion in an amount to be proved at trial.

## COUNT VII

### Breach of Contract

114. Plaintiffs incorporate by reference and reallege all paragraphs previously alleged herein.

115. Defendants engaged in a pattern and practice of charging and collecting sums in excess of those specified in the equipment lease and applications provided to

Plaintiffs and class members and by imposing different terms on the lease and contract than those promised and revealed to Plaintiffs and class members.

116. In so doing, to the extent that Plaintiffs and the members of the Class entered into enforceable contracts with Defendants, Defendants breached those contracts. Defendants willfully and systematically concealed the terms of the contracts from Plaintiffs, the Class, and the general public, in a practice that is ongoing.

117. Defendants further breached the covenant of good faith and fair dealing implied in every contract.

118. Plaintiffs and the Class members have been damaged by Defendants' breach of contract as described herein.

119. By reason of the foregoing, Defendants are liable to Plaintiffs and the class members for breach of contract in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for relief as follows:

1. Certifying the Class and appointing Plaintiffs and their counsel to represent the Class;

2. Awarding Plaintiffs and the Class compensatory damages and restitution and/or disgorgement and other equitable relief as the Court deems proper;

3. Enjoining Defendants from engaging in all practices described herein; awarding Plaintiffs and the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees and expert-witness fees and other costs as may be deemed applicable; and

4.  Awarding such other and further relief as this Court may deem just and

proper.

### DEMAND FOR JURY TRIAL

Plaintiffs, and all others similarly situated, hereby demand a trial by jury of all

claims so triable herein.

Respectfully submitted
CYGNET CORPORATION, d/b/a
Cygnet Restaurant, On Behalf of
Themselves, the General Public and
All Others Similarly Situated
By their attorneys,


Orestes Brown (BBO #566431)
Keith L. Sachs (BBO #634025)
Shaun M. Khan (BBO #681080)
METAXAS BROWN PIDGEON LLP
900 Cummings Center, Suite 207T
Beverly, MA  01915
978-927-8000
obrown@metaxasbrown.com
ksachs@metaxasbrown.com
skhan@metaxasbrown.com

Dated: March ⁄ᄂ⁄, 2013

G:\Client Files\Glesener, Jim\Class Action Suit\Pleadings\Complaint (Class Action) 11-29-12.doc

32

EXHIBIT A



EXHIBIT B

LESSOR HAS ASSIGNED TO WACHOVIA BANK, NATIONAL ASSOCIATION, SUCCESSOR BY MERGER TO CONGRESS FINANCIAL CORPORATION ("WACHOVIA") AND HAS GRANTED WACHOVIA A SECURITY INTEREST IN ALL RIGHT, TITLE AND INTEREST OF LESSOR IN AND TO THIS LEASE, ALL PRESENT AND FUTURE RENTAL, LEASE AND OTHER PAYMENTS AND CHARGES OWED TO LESSOR HEREUNDER AND ALL PRODUCTS AND PROCEEDS THEREOF, PURSUANT TO THE LOAN AND SECURITY AGREEMENT, DATED MAY 9, 1994, AS AMENDED, BETWEEN WACHOVIA AND LESSOR, AS THE SAME NOW EXISTS AND MAY HEREAFTER BE AMENDED, MODIFIED, SUPPLEMENTED, EXTENDED, RENEWED, RESTATED OR REPLACED.

# GLOBAL
## LEASING COMPANY
866-950-4961

**NON-CANCELLABLE LEASE**

1880949

| | REP CODE | OFFICE NUMBER | LEASE NUMBER |
|---|---|---|---|
| | MPRST | MPRST | 1001940 |

VENDOR
**PAYMENT SYSTEMS**

LEGAL NAME OF LESSEE (LESSEE): Cygnet Corp Mgt

ADDRESS: 750 North St Paul Street Suite 1350

| BILLING ADDRESS | | | | CITY | STATE | ZIP |
|---|---|---|---|---|---|---|
| 24 West St | | | | Dallas | TX | 75201 |

| CITY | STATE | ZIP | PHONE NO. | LESSOR NUMBER |
|---|---|---|---|---|
| Beverly | MA 01915 | 972-996-2076 | 03414130152810 |

| LESSEE PHONE NO. | COUNTRY | YEARS IN BUSINESS |
|---|---|---|
| 978-922-9221 | USA | 10 yrs |

| EQUIPMENT MANUFACTURER | MODEL | SERIAL NUMBER |
|---|---|---|
| VX 510 | Verifone | VB 214-156-477 / 214-156-478 |
| | SE 1000 @ 214-150-476 | 892-973-280 / 292-948-715 |

LOCATION OF EQUIPMENT (homes, street, City, State, Zip) if different from above.

## SCHEDULE OF LEASE PAYMENTS

BASE MONTHLY LEASE PAYMENT $ 297 plus applicable taxes, and Loss & Destruction Waiver fee of $4.95 per month per unit of equipment, if applicable, as provided in Section 15 of this Lease, for a MINIMUM LEASE TERM of 48 Months (Lease Term)

**PAYABLE AT SIGNING OF THE LEASE**

☐ FIRST AND LAST MONTHLY PAYMENT   $
☐ FIRST MONTHLY PAYMENT   $
☐ LAST MONTHLY PAYMENT   $

BANK Sovereign Corp   ROUTING NO. 011410715105101   ACCOUNT NO. 673 00001808

## LEASE ACCEPTANCE

No attempt at oral modification or termination of this lease or any item thereof will be binding upon the parties.   LESSEE'S INITIALS

THE UNDERSIGNED HAS READ ALL PAGES OF THIS LEASE FILLED IN AND AGREES TO BE BOUND BY ALL THE TERMS OF THIS LEASE.

ACCEPTED IN LOS ANGELES, CALIFORNIA
BY LESSOR:

| ACCEPTED BY LESSOR | ACCEPTED BY LESSEE | LESSEE (FULL LEGAL NAME) |
|---|---|---|
| Global Leasing Company Authorized Signature | LESSEE #1 X Signature | LESSEE #2 (if applicable) X Signature |
| Title Processor   Date 6/5/12 | Print Name   James Sylvera   Title President   Date 5-14-12 | Print Name   Title   Date |

## PERSONAL GUARANTY

| | Guarantor Signature | |
|---|---|---|
| | X James Sylvera | ☐ Individual |
| Home Address 313 Hart St | | (No Str Street) |
| City Beverly Farms   State MA   Zip 01915 | | State   Zip |
| Home Phone 617-671-0739   SS# 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 | Home Phone# | S.S.# |

## TERMS AND CONDITIONS (Continued on page 2)

1. We have written this Equipment Finance Lease Agreement ("Lease") to the best of our ability to make it easy to understand. We use the words "you" and "your" to mean the Lessee listed above, and the words "we," "us," and "our" to refer to the Lessor listed above and its designees, successors and assigns. Please carefully read both pages of this Lease for all the terms and conditions of this Lease, you first have to contact us at the number listed above when any questions you may have.

2. We agree to purchase from the Vendor the equipment listed above ("Equipment")

and lease the Equipment to you under the terms set forth in this Lease. So long as you are not in default under any of the terms in this Lease, we will not interfere with your rights and enjoyment of the Equipment.

3. AUTHORIZATION FOR AUTOMATIC WITHDRAWAL OF PAYMENTS. You authorize us to automatically withdraw your monthly lease payment and any other amounts now due, hereinafter incurred, or otherwise owed in connection with this Lease, including applicable taxes and a Loss and Damage Waiver fee, if applicable, by initiating via the Automated Clearing House (ACH) system (which applies to

Lessee Initials

EXHIBIT C

Lease Finance Group LLC
65 E. Wacker Place, Suite 510
Chicago, IL 60601
ADDRESS SERVICE REQUESTED



*Personal & Confidential*

BWNBZWJ
#I887949# MPRST

|||....|||||....||||||.|..|.||.|.|||....|.|||.|.|.||.||..||

CYGNET CORP
JAMES GLESENER
24 WEST STREEST
BEVERLY MA 01915-2202

June 28, 2012

Re:  Non Cancelable Equipment Finance Agreement No. 1887949 between Cygnet Corp as Lessee and Lease
     Finance Group LLC, as Lessor.

Dear James Glesener:

Thank you for choosing Lease Finance Group LLC. to provide lease financing for your Verifone 1000 Se, Verifone
Vx 510 equipment(s).

**As you know, pursuant to the terms of your lease, you are required to maintain insurance covering the
equipment and to provide proof of that insurance by sending us a certificate of insurance from your insurance
company. As of this date, we have not received such evidence of insurance. In the absence of our receipt of a
certificate of insurance issued by your insurance company, we have elected to provide to you a Loss Damage
Waiver (as provided in the lease agreement). The monthly charge for this waiver is $4.95 per unit of
equipment and this will be added to the rental amount charged to you each month until we receive satisfactory
proof of insurance from your insurance company. Please refer to the lease agreement for a full explanation of
this program and your responsibilities in this regard.**

Lease Finance Group LLC is committed to providing you with the highest quality of service.  Should you have any
questions with regards to the terms and conditions of your lease (a copy of which is attached), please direct them to
our Customer Service Department at (866) 781-0440. Please reference your lease # indicated above.

Sincerely,

LEASE FINANCE GROUP LLC

Enc.

EXHIBIT D



## BILL OF SALE AND ASSIGNMENT

KNOW ALL MEN BY THESE PRESENTS, that Lease Finance Group, LLC., a Delaware limited liability corporation having its principal office and place of business at 65 East Wacker Place, Suite 510, Chicago IL 60601 ("Purchaser"), for good and valuable consideration received from Global Asset LLC dba Global Leasing, having its principal office and place of business at 8605 Santa Monica Blvd., Suite 19766, Santa Monica, California 90069, ("Seller"), the receipt and sufficiency of which is hereby acknowledged, has bargained, sold, transferred, assigned, set over and conveyed, and by these presents does bargain, sell, transfer, assign, set over and convey unto Purchaser, its successors and assigns forever, the Lease, named as _Cygnet Corp_ , a copy of which attached hereto having lease number _1081740_ and made a part hereof, the Equipment subject to such Lease, and all rights and remedies under the Lease, including the right either in Seller's own name or in the name of Purchaser to take all such proceedings, legal or otherwise, as Seller might have taken save for this Bill of Sale and Assignment (collectively, the "Purchased Assets").

TO HAVE AND TO HOLD the Purchased Assets unto Purchaser, its successors and assigns, to its and their use and behalf forever.

Seller, for itself and its successors and assigns, covenants and agrees to do, execute and deliver, or to cause to be done, executed and delivered, all such further acts, transfers and assurances, for the better assuring, conveying and confirming unto Purchaser and its successors and assigns, all and singular, the Purchased Assets hereby bargained, sold, assigned, transferred, set over and conveyed, as Purchaser and its successors and assigns shall reasonably request.

By acceptance of the Bill of Sale and Assignment, Purchaser agrees and acknowledges that its interest in the Equipment conveyed to it by this Bill of Sale and Assignment is subject to the rights of the Lessee under the Lease relating to the Equipment described therein.

IN WITNESS WHEREOF, the parties hereto have caused this Bill of Sale and Assignment to duly executed on behalf of each of them as of this __25__ day of __June__, 2012.

PURCHASER     LEASE FINANCE GROUP, LLC.

By:

Title:

SELLER :     GLOBAL LEASING

By:

Title:

EXHIBIT E

7/6/12 8:33 AM

# Sovereign  Santander  **Online Banking**

Help Center
Log Out
**Welcome JAMES CLETUS GLESENER**
Last sign in: 07/05/2012 at 11:15 a.m ET

Accounts
Transfers
BillPay
Mortgages
Customer Service
## Accounts
Overview
Account Details and Activity
Account Services
Statements
Rewards
**Quick Transfer**

Transfer from...
Transfer to...

Date
07 / 06 / 2012
Amount $            Go

🖨 Print | ❓ Help with this page

## Account Details and Activity

Account Number: Sme checking - *1468        Go

Available Balance: **$19,546.13**              Ledger Balance: **$19,127.67**

Activity Details

Date:  from 05 / 06 / 2012   to 07 / 06 / 2012                    Search

Advanced Search |  Download History

Posted Activity

| Date | Activity Description | Deposits | Withdrawals | Balance |
|------|---------------------|----------|-------------|---------|
| 07/05/2012 | AMERICAN EXPRESS SETTLEMENT120705 2200294106 | $1,812.49 | | $21,012.82 |
| 07/05/2012 | FDMS-SETTLEMENT DEPOSIT 120704 235214752992 | $2,245.52 | | $19,200.33 |
| 07/05/2012 | FDMS-SETTLEMENT DEPOSIT 120705 235214752992 | $2,444.52 | | $16,954.81 |
| 07/03/2012 | CHECK 000000003285 884723200 | | -$7.68 | $14,510.29 |
| 07/03/2012 | CHECK 000000003253 884723205 | | -$25.58 | $14,517.97 |
| 07/03/2012 | CHK CARD PURCHASE ABE & LOUIES BOSTON /MA US | | -$40.00 | $14,543.55 |
| 07/03/2012 | BANKCARD-8779 MTOT DISC 120630 534914130152812 | | -$46.96 | $14,583.55 |
| 07/03/2012 | CHECK 000000003352 873196995 | | -$56.39 | $14,630.51 |
| 07/03/2012 | CHECK 000000003317 884723195 | | -$89.74 | $14,686.90 |

7/5/12 11:16 AM

0-0   records

Advanced Search| ⟳ Download History

| Date | Activity Description | Deposits | Withdrawals | Balance |
|------|---------------------|----------|-------------|---------|
| 07/03/2012 | CHECK 000000003285 884723200 | | -$7.68 | $14,510.29 |
| 07/03/2012 | CHECK 000000003253 884723205 | | -$25.58 | $14,517.97 |
| 07/03/2012 | CHK CARD PURCHASE ABE & LOUIES BOSTON /MA US | | -$40 | $14,543.55 |
| 07/03/2012 | BANKCARD-8779 MTOT DISC 120630 534914130152812 | | -$46.96 | $14,583.55 |
| 07/03/2012 | CHECK 000000003352 873196995 | | -$56.39 | $14,630.51 |
| 07/03/2012 | CHECK 000000003317 884723195 | | -$89.74 | $14,686.90 |
| 07/03/2012 | CHK CARD PURCHASE HANNAFORD #8345 NORTH WINDHA/ME US | | -$205.14 | $14,776.64 |
| 07/03/2012 | LEASE FINANCE GR LEASE PYMT070212 1867949:0702 | | -$336.95 | $14,981.78 |
| 07/03/2012 | CHECK 000000010278 884633355 | | -$2402.52 | $15,318.73 |
| 07/03/2012 | AMERICAN EXPRESS SETTLEMENT120703 2200294106 | $1,722.45 | | $17,721.25 |

1-10   10   records

📄 View More Transactions

**You may also want to:**

View Full Account Number

Privacy Policy
Customer Agreement and Disclosures
Online Banking Guarantee
Accessibility
Copyright 2012 Sovereign Bank. All rights reserved. Equal Housing Lender - Member FDIC

001 001 2012   11:13   5105225202

Payment Systems
3 Western MD Pkwy.
Hagerstown, MD 21740

July 25, 2012



lll....llll...ll.l.l..l.l.l.lll....l.ll.l.l..l.l.l
C5 P8•••••••AUTO••MIXED AADC 913 PCI D20 [July]
CYGNET CORP
24 WEST ST
BEVERLY, MA 01915-2202

RE: Merchant Number 534914130152812

Dear Valued Merchant:

Thank you for choosing Payment Systems for your payment processing needs. We value your business and want to continue helping you realize the benefits of our relationship. Part of our commitment is to inform you of changes that may affect your merchant account, including updates to your fees and the requirement of all merchants to maintain Payment Card Industry (PCI) Data Security Standard (DSS) compliance. Please take a moment to read this entire letter to learn more about our PCI Compliance Assistance Service Program, new applicable fees and how you can minimize your costs and risks by becoming PCI DSS compliant.

**PCI DSS Compliance Requirement**
The payment brands (American Express, Discover Financial Services, JCB International, MasterCard Worldwide and Visa Inc.) have mandated that all merchants who store, transmit or process cardholder information must maintain compliance with the PCI DSS. We, as your service provider, take the protection of customer and payment account data very seriously. We understand the risks and financial costs that a compromise can pose to your business. In support of this important mandate, we require all of our merchants to validate their PCI DSS compliance status with us and want to make the process as convenient as possible for you.

**Our Compliance Assistance Service Program**
Payment Systems has arranged PCI compliance services through the First Data PCI Rapid Comply solution, an easy-to-use online SAQ and integrated scanning tool that offers:
- **Step-by-step guidance to complete the annual self-assessment questionnaire (SAQ)** -
   The step-by-step application will direct you to the PCI SAQ that is appropriate for your business (A, B, C, C-vt or D). You can complete the SAQ with guided support, ensuring each question is answered accurately.
- **Fewer questions to answer – in some cases, 85% fewer questions:** With "pre-SAQ" questions, the application can help pre-populate the appropriate SAQ answers – which are

**Applicable Fees**

Effective with your August 2012 month end merchant statement, your merchant agreement will be amended to include the following fees:

- A $150.00 Compliance Service Fee will be added to your Payment Systems merchant account. This fee will be charged annually on or after August 31, 2012. As part of this fee, the PCI compliance services provided by the PCI Rapid Comply solution described above will be provided to you at no additional charge. Please note that the payment of this fee does not affect your PCI-DSS compliance responsibilities associated with your account.
- A $19.95 monthly Non-Receipt of PCI Validation Fee that may be billed in any given month your account is deemed non-compliant with the PCI DSS. To allow you time to complete the PCI DSS certification process, this fee will not be added to your account until October 31, 2012. If we do not receive validation of your compliance by October 25, your account will be billed $19.95 on your October month-end statement and in each month thereafter until we receive the required validation. Please note that you must maintain PCI compliance at all times and recertify your compliance annually (or quarterly, if applicable) in order to avoid this fee in the future. In addition, we reserve all of our rights under the merchant agreement including, but not limited to, terminating your services for non-compliance with association rules and regulations.

Maintaining your merchant account with us or use of your merchant account on or after August 25, 2012 will represent your acceptance of these terms.

While participation in the PCI Compliance Service Assistance Program helps to mitigate the risk of a security breach or data compromise, participation does not guarantee or prevent a security breach or compromise.

If you still have questions, we encourage you to contact our Customer Service Department at the phone number printed on your merchant statement for additional information. We appreciate your business.

Sincerely,
Payment Systems